UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BONNIE LONDON,<br><br>Plaintiff,<br><br>vs.<br><br>BRULE COUNTY, ITS AGENTS, SUBSIDIARIES, AND EMPLOYEES; BUFFALO COUNTY, ITS AGENTS, SUBSIDIARIES, AND EMPLOYEES; TORY ENGEL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; BRANDON NEITZERT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; WAYNE WILLMAN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; and JOHN DOES 1-50,<br><br>Defendants. | 4:18-CV-04001-KES<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Bonnie London, brought this action for money damages under 42 U.S.C. § 1983. Docket 1. The named defendants are Tory Engel, Brandon Neitzert, and Wayne Willman in their individual and official capacities, Brule and Buffalo Counties, and John Does 1-50. *Id.* Pending before the court are two summary judgment motions. Dockets 15, 27. The first motion was filed by defendants Buffalo County, Brandon Neitzert, and Wayne Willman. Docket 15. The second was filed by defendants Brule County and Tory Engel. Docket 27.

## FACTUAL BACKGROUND

The facts, viewed in the light most favorable to Bonnie London, the non-moving party, are as follows:

On January 7, 2015, Bonnie London received a phone call from her son, Donald London. Docket 26 ¶ 2. Donald told her that he was at her mother's residence five to six miles outside of Kimball, South Dakota, in rural Brule County. *Id.* ¶¶ 1, 2. He stated he missed his late wife and needed psychiatric help. *Id.* ¶ 2. Donald suffered from paranoid schizophrenia. *Id.* ¶ 14. Michael London, Bonnie London's ex-husband, was also at the residence. *Id.* ¶ 3. Donald was upset about interactions he had with law enforcement the day prior. *Id.* ¶ 14. Law enforcement had been notified Donald was threatening to kill the Chamberlain police chief. *Id.* ¶ 1.

On January 6, 2015, the previous day, Bonnie London called Brule County sheriffs' deputies to the residence because Donald was having an "issue" and she was not sure if Michael would be able to "keep him under control." Docket 29 ¶ 3.[1] Sheriff Darrell Miller, accompanied by two City of

---

[1] Under Local Rule 56.1, "[a]ll material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1(D). Bonnie London did not respond to defendants Brule County and Tory Engel's Statement of Undisputed Material Facts (Docket 29). Thus, these facts are deemed admitted, excluding those denied in Bonnie London's objection to defendants Buffalo County, Brandon Neitzert, and Wayne Willman's statement of undisputed material facts (Docket 26).

Chamberlain police officers, went to the residence. *Id.* ¶ 6. The officers found Donald in the basement, cradling a rifle in his hand. *Id.* ¶ 9.

Sheriff Miller called Steve Smith, director of mental health, to seek a mental health hold on Donald. *Id.* ¶ 14. Rather than pursuing a mental health hold, Michael offered to take Donald to the mental health hospital in Sioux Falls where Donald had received treatment previously. *Id.* ¶ 15. Smith authorized this plan, so long as all weapons in the house were locked up. *Id.* ¶ 16.

Donald and Michael left town. *Id.* ¶ 17. Sheriff Miller verified that the two actually left the city, in accordance with the plan to get Donald treatment in Sioux Falls. *Id.* But Donald and Michael stopped and turned around at Salem instead of continuing on to Sioux Falls. *Id.* They then visited a local mental health clinician who Donald had seen in the past. *Id.* ¶ 18. The clinician advised Donald to cease taking all his mental health medication. *Id.* ¶ 19.

The following day, January 7, 2015, Michael called Sheriff Miller because Donald was upset, believing agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives were coming to the residence. *Id.* ¶ 21. At around 12:15 p.m., Michael informed Sheriff Miller that Donald had left the residence for Kimball to retrieve guns. *Id.* ¶ 22. At around 12:56 p.m., Michael informed Sheriff Miller that Donald had successfully obtained guns from Michael's trailer home in Kimball. *Id.* ¶ 23. He also informed Sheriff Miller that Donald was very upset and was planning to go to Chamberlain to shoot an officer who had pointed a gun at him the day prior. *Id.* ¶ 24. Around half an hour later, Michael

told Sheriff Miller that Donald was back at the residence, "packing up gear" in preparation to leave for Chamberlain and carry out his threat. *Id.* ¶ 25.

That afternoon, between 1:00 p.m. and 3:00 p.m., Bonnie London drove to the residence. Docket 26 ¶ 3. When Bonnie London arrived, Donald was on the phone with Sheriff Miller. *Id.* ¶ 4. A few minutes later, Michael notified Donald and Bonnie London that there were vehicles in the driveway. *Id.* ¶ 4. Donald became upset, believing someone was after him. *Id.* ¶ 4. Bonnie London then drove her car down the driveway to identify the vehicles. *Id.* ¶ 5.

Before Bonnie London drove down the driveway, Special Agent Brandon Neitzert arrived at the property. *Id.* ¶ 6. Neitzert did not approach the home, but instead, interviewed Michael Urban, Donald's uncle. *Id.* ¶ 7. Urban told Neitzert that Donald had a history of anger toward law enforcement, and that Donald had made threats to law enforcement in the past. *Id.* ¶ 8. He also indicated Donald had fired a gun inside the home and may be suicidal. *Id.*

As the interview with Urban concluded, Bonnie London was in the driveway. *Id.* ¶ 5. Unmarked law enforcement stopped Bonnie London and searched her person. *Id.* ¶ 10. Neitzert ordered other officers to search her vehicle. *Id.* London asserts that the officers held her at gun point while searching her person, Neitzert did not have a warrant to search her car, and she was not arrested. *Id.* The officers seized her cell phone and car keys. *Id.* ¶ 11.

Defendant, Brule County Sherriff's Deputy Tory Engel, then escorted Bonnie London to his patrol vehicle and placed her in the back cage. *Id.* ¶ 12.

Engel did not handcuff her. *Id.* Shortly thereafter, Neitzert removed Bonnie London from Engel's patrol vehicle and escorted her to his own vehicle for an interview. *Id.* ¶ 13. Neitzert placed her in the front seat of his vehicle and did not handcuff her. *Id.*

During the interview, Bonnie London told Neitzert that Donald had a general dislike of law enforcement and that he had had incidents with law enforcement on the previous two days. *Id.* ¶ 14. She said he was upset officers were currently outside the house. *Id.* London asserts that she also told Neitzert that Donald was suffering from paranoid schizophrenia, but that the situation was manageable and he would be resuming treatment. *Id.*

According to Bonnie London, at the end of the interview, she became concerned because she saw armed men dressed in black and more trucks with armed men arriving on the property. *Id.* ¶ 15. London asserts that she asked Neitzert if the men were there to kill her son. *Id.* He did not respond. *Id.* Both parties agree that Agent Neitzert informed Bonnie London that until law enforcement knew what the situation was at the residence, she would not be allowed to leave the scene. *Id.* ¶ 16.

Bonnie London was once again placed in Engel's patrol vehicle. *Id.* ¶ 17. She was not handcuffed or restrained and was not further interviewed. *Id.* According to Bonnie London, officers were instructed to hold her in the car at the scene. *Id.* Eventually, the officers allowed her to go to her vehicle and retrieve dry socks. *Id.* ¶ 18.

After the interview with Neitzert, Bonnie London heard a single gunshot coming from the residence. *Id.* ¶ 26. Defendants report hearing multiple gunshots, and when Neitzert returned to the residence the following day to photograph the crime scene, he found damage consistent with multiple rifle rounds. *Id.* ¶¶ 26, 31. A radio report indicated a highway patrol sergeant had been shot at the home. *Id.* ¶ 27. The shooting marked the beginning of a 24-hour standoff between Donald, Michael, and the law enforcement officers. *Id.* ¶ 28.

After the shooting, Bonnie London was placed in the back cage of Buffalo County Sheriff Wayne Willman's patrol vehicle. *Id.* ¶ 18. Sheriff Willman had been told that London was being held for questioning and to provide information about the inside layout of the residence. *Id.* ¶ 19. Sheriff Willman did not question Bonnie London. *Id.* ¶ 20. He offered her food and water. *Id.* ¶ 21. Sheriff Willman states he offered to bring Bonnie London to Kimball to use an indoor restroom. *Id.* ¶ 22. But London asserts that when she needed to use the restroom, Sheriff Willman instructed her to relieve herself outside instead of offering to take her into Kimball to use an indoor restroom. *Id.* ¶ 22. She relieved herself in this manner several times that night and early the next morning. *Id.* ¶ 23. While she was relieving herself behind Sheriff Willman's vehicle, he stood in front of the vehicle, and did not watch. *Id.* ¶ 23.

Eventually, Bonnie London was moved to the front seat of Sheriff Willman's vehicle because it was warmer than the back cage. *Id.* ¶ 24. She was released at around 7:00 a.m. on January 8, 2015 after being interviewed by a

separate state Division of Criminal Investigation agent. *Id.* ¶ 30. The standoff between Donald, Michael, and the officers ended at around 3:00 p.m. that day. *Id.* ¶ 31.

## **LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact.").

Once the moving party meets its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). For purposes of summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### I. Are defendants Tory Engel, Brandon Neitzert, and Wayne Willman liable in their individual capacities under 42 U.S.C. § 1983?

Section 1983 of the Civil Rights Act provides that "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. Qualified immunity shields government officials from § 1983 suits in their individual capacities if an official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This inquiry requires that a plaintiff show both (1) an official violated her statutory or constitutional right, and (2) the right was "clearly established" at the time of the violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). If a plaintiff fails to establish either prong of this test, she cannot overcome an official's claim of qualified immunity. *Id.* The court has the discretion to address either prong of the two-part test first. *Id. See also Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the plaintiff cannot establish that a constitutional violation was "clearly established" at the time of the alleged deprivation, the court does not need to reach the first question of whether the plaintiff's constitutional rights were violated. *Pearson*, 555 U.S. at 236.

A plaintiff seeking to overcome an official's assertion of qualified immunity must show that the right asserted was "clearly established" at the

time of the alleged violation. *Harlow*, 457 U.S. at 818. For a right to be clearly established, its contours "must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This inquiry focuses on whether the officer had fair notice that his conduct was unlawful. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). The clearly established requirement "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6, (2013) (per curiam) (internal quotation omitted).

To determine clear establishment, the court must consider the "specific facts at issue" and refer to authorities "squarely govern[ing]" those facts. *Kelsay v. Ernst*, 933 F.3d 975, 980 (8th Cir. 2019) (en banc). Courts must " 'not . . . define clearly established law at a high level of generality.' " *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quoting *Ashcroft*, 563 U.S. at 742). " '[P]recedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.' " *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The rule cannot be merely "suggested" by existing precedent. *Id.*

The Eighth Circuit has repeatedly emphasized the importance of factual distinctions when determining qualified immunity. In *Kelsay*, an *en banc* Eighth Circuit panel defined the right at issue as whether a deputy may use a

9

"takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here' and continued to walk away from the officer," rather than a more general prohibition on employing force against a nonviolent misdemeanant who poses no threat to officers and is not actively resisting arrest or attempting to flee. 933 F.3d at 980. Similarly, in *Rudley v. Little Rock Police Department*, the Eighth Circuit employed a detailed factual analysis to distinguish precedent that, although similar, did not adequately provide notice to the defendants of the constitutionality of their conduct. 2019 WL 4145075, at *3 (8th Cir. Sept. 3, 2019). The Court found that officers did not violate a plaintiff's clearly-established right to be free from unreasonable force when they repeatedly tased her, despite her presenting no physical threat, because she had "physically inserted herself between" the officer and her son, "directed an expletive at" the officer, "and stepped toward [the officer], ignoring his command to stop." *Id.*

The Supreme Court similarly emphasizes fact-sensitivity in qualified immunity determinations. Officers are entitled to qualified immunity in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue," because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1153 (2018) (internal quotation omitted). While Bonnie London does not claim an excessive force violation, Fourth Amendment seizure claims also "depend[] very much on the facts of each case." *Id.*

The facts here, viewed in the light most favorable to Bonnie London, show that defendants knew that a suspect, Donald, was armed. Docket 29 ¶ 23. They were aware that he had a general animosity towards law enforcement, and had made threats against law enforcement in the past. Docket 26 ¶ 8. They had been told he was suicidal. *Id.* They were also aware Donald was behaving erratically and "packing up gear" to carry out a planned violent attack on law enforcement. Docket 29 ¶ 25.

Importantly, defendants also knew that Bonnie London, as Donald's mother, possessed information about his mental health conditions. Docket 26 ¶ 14. She was an available witness with information about the layout of the home in which Donald and Michael had sequestered themselves. Docket 26 ¶ 19. Once an officer was shot, and numerous rounds were fired on the property, defendants faced the question of how best to keep Bonnie London safe at the scene. *Id.* ¶¶ 26-28. And after the shooting, a reasonable officer could have assumed that retaining a source for information about the home became even more important.

Applying the level of specificity dictated by controlling case law to the above facts, the right at issue is a non-suspect's right to be free from detention for all or part of an armed suspect's standoff with police when the suspect has fired at officers and the non-suspect is an available witness to important information like the layout of the estate and the suspect's background.[2]

---

[2] Bonnie London alleges only that her detention during the standoff and the seizure of her phone and keys violate the Fourth Amendment. She does not

Existing Supreme Court and Eighth Circuit case law does not address limitations on non-suspect detention to gather information about an armed suspect, or non-suspect detention after an officer-involved shooting. Nor does the case law support the claim that an officer may not detain an individual to interview as a witness in an armed standoff. Case law is similarly silent on whether a witness's keys and cell phone can be seized and held for the duration of her time in custody during a standoff. Thus, the law was not clearly established that defendants were not permitted to detain Bonnie London under these circumstances.

And while Bonnie London offered substantial case law regarding the general Fourth Amendment right to be free from unreasonable seizure, these cases do not address the specific factual contours of this case. *Terry* involves brief detention and search of a man suspected of "casing" a retail store. *Terry v. Ohio*, 392 U.S. 1, 6-8 (1968). *Place* discusses the standard required to seize the luggage of a suspected narcotics trafficker. *United States v. Place*, 462 U.S. 696, 698-99 (1983). *Beck* defines the factors that may support reasonable suspicion to detain a motorist suspected of drug trafficking during a routine traffic stop. *United States v. Beck*, 140 F.3d 1129, 1137-38 (8th Cir. 1998). *Willis* holds that an investigative stop of a suspected criminal must be the

---

allege or discuss in her briefs that the initial search of her vehicle or person ordered by Neitzert was a Fourth Amendment violation. Docket 1 at 2-3; Docket 23 at 5-6; Docket 33 at 3. As such, the court will not discuss that issue.

"least intrusive means available" to verify or dispel officers' suspicion that the individual committed a crime. *United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). *Summers* involves a warrant for a search of the defendant's house for narcotics, and the detention of the defendant during that search. *Michigan v. Summers*, 452 U.S. 692, 705 (1981). *Maltais* involves a suspected smuggler's detention near the Canadian border. *United States v. Maltais*, 403 F.3d 550, 553-54 (8th Cir. 2005).

*Illinois v. Lidster* is the only case the court is aware of that addresses detention of a non-suspect for public safety and information gathering purposes. 540 U.S. 419, 426-27 (2004). *Lidster* involved the brief detention of motorists for information-gathering about a hit-and-run accident. *Id.* It established a balancing test for judging the reasonableness of detaining non-suspect witnesses. *Id.* The test requires looking to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* (internal quotation omitted). But because neither the Eighth Circuit nor Supreme Court has applied *Lidster* to facts similar to those here, it does not clearly establish that Bonnie London's detention was a violation of her Fourth Amendment rights.

The parties dispute several issues of fact, but none are material to whether defendants violated a clearly established right. First, Bonnie London notes that she informed the officers the situation unfolding at the residence was "manageable." Docket 26 ¶ 14. She informed the officers that Donald was

13

going to get treatment for PTSD and paranoid schizophrenia. *Id.* She notes that Brule County officers knew Donald was upset about an incident that happened the day prior. *Id.* She also notes that Donald had told Sheriff Miller "there would be no issues or problems from him whatsoever." Docket 23 at 2.

An assertion that Donald was not a genuine threat, and thus defendants lacked reason to act, stands at odds with the uncontested facts. The officers knew Donald possessed several guns inside the residence, had made threats against law enforcement, was suicidal, and had taken steps towards shooting an officer in Chamberlain. Docket 29 ¶¶ 23-25; Docket 26 ¶¶ 8. Thus, whether or not officers were informed the situation was "manageable" is immaterial. The officers would have acted reasonably in disregarding Bonnie London's opinion of her son's state in favor of taking a credible threat seriously.

Second, the parties dispute whether Sheriff Willman offered to take Bonnie London to Kimball to use the restroom, and whether she affirmatively asked to leave the scene. Docket 26 ¶ 22. But these disputes are not material to the question of qualified immunity. A right to be free from mandatory detention during the violent stand-off was not "clearly established" at the time, as discussed above. Nor do any cases point to a defendant's right to be offered an indoor bathroom when being detained during such a standoff. Bonnie London may have, unfortunately, suffered unnecessary discomfort and embarrassment because of the officers' failure to offer to take her to Kimball. But the officers' decision to keep her at the scene was not contrary to "existing precedent squarely govern[ing] the specific facts at issue." *Kelsay*, 933 F.3d at

14

980 (quoting *Kisela*, 138 S. Ct. at 1153). Neither course of action amounts to "plain[] incompeten[ce]" or a "knowing[] violat[ion] [of] the law." *Stanton*, 571 U.S. at 6 (per curiam) (internal quotation omitted). Thus, these disputes of fact cannot defeat defendants' summary judgment motions.

Bonnie London did not meet her burden of showing that her constitutional right was clearly established. Defendants Engel, Nietzert, and Willman in their individual capacities are shielded from suit under the doctrine of qualified immunity and summary judgment is granted in their favor on the § 1983 claims.

**II.    Are defendants Buffalo County, Brule County, and individual defendants in their official capacities liable under 42 U.S.C. § 1983?**

A suit against a public employee in his or her official capacity is the legal equivalent of a suit against the governmental entity itself. *Bankhead v. Knickrehm*, 360 F.3d 839, 844 (8th Cir. 2004). In an official-capacity suit against a local government body, a plaintiff must show a constitutional right violation was caused by an official policy or widespread custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). "[N]either municipalities nor government officials may be held liable for unconstitutional conduct under a theory of respondeat superior." *Rogers v. King*, 885 F.3d 1118, 1122-23 (8th Cir. 2018) (citing *Monell*, 436 U.S. at 691). Thus, a governmental entity is liable under § 1983 "only when the entity itself is a 'moving force' behind the violation. That is, the entity's official 'policy or custom' must have 'caused' the constitutional violation . . . ." *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir.

15

1987). "[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

Similarly, "[s]uits against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). A state employee sued for money damages in his or her official capacity is protected by the same sovereign immunity held by the state itself under the Eleventh Amendment. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66-67 (1989). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law' " in order for the official to be sued. *Hafer*, 502 U.S. at 25 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal quotation omitted)).

Here, Bonnie London sues Buffalo County and Brule County, both government entities, in addition to Deputy Sheriff Engel and Sheriff Willman, county officials, and Special Agent Neitzert, a state official, in their official capacities. For these defendants to be subject to liability, any potential deprivation suffered by Bonnie London must have been caused by one or both of the counties' — or in Neitzert's case the state's — "policy or custom."

Even if Bonnie London suffered a constitutional violation, Buffalo County, Brule County, Engel, Willman, and Neitzert met their initial summary judgment burden of showing there is no genuine issue of material fact as to whether an official "policy or custom" caused Bonnie London's alleged

deprivation. Docket 17 at 11-12; Docket 28 at 15-17. Bonnie London failed to allege in her complaint or point to any evidence in the record of an official policy or custom that caused her alleged deprivation. She asserts that because "discovery is ongoing" and "policies and procedures have not been requested or expanded upon," a genuine issue of material fact exists. Docket 23 at 4. But this claim rests on "mere allegations" and does not "demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley*, 415 F.3d at 910 (8th Cir. 2005). Because of Bonnie London's failure to raise a genuine issue of material fact as to whether an official policy or custom caused the deprivation she alleges, Brule County, Buffalo County, and defendants in their official capacity are not liable. Thus, summary judgment is granted in those defendants' favor for all claims.

### III.  Dismissal of Claims Against John Does 1-50

The court-imposed deadline for the parties to move to join additional parties or to amend the pleadings was June 1, 2018. Docket 14. Bonnie London has not moved to name or serve John Does 1-50. Because the deadline to amend has passed, the court on its own motion dismisses the claims against John Does 1-50 without prejudice.

### IV.  Dismissal of State-Law Claims

Where state and federal claims are joined and all federal claims are dismissed on summary judgment, the remaining state claims are usually dismissed without prejudice in the interest of comity. *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999). Here, all of Bonnie

London's federal claims are disposed of via summary judgment, as discussed above. As such, Bonnie London's remaining state-law tort claims — false imprisonment and intentional infliction of emotion distress — are dismissed without prejudice.

**CONCLUSION**

Thus, it is

ORDERED that defendants' motions for summary judgment (Dockets 15, 27) are GRANTED.

IT IS FURTHER ORDERED that the claims against defendants John Does 1-50 are dismissed without prejudice.

Dated September 23, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE